Ruth **KREITNER**, Elizabeth Miller **Murphy, Viola Beverly, Lavern Maier, Imogene Holmes, Wilma Rhinehart Roper, Mary L. Joseph, Maxine Wood, Frances Proctor, Elva Methling, Augusta Huelsberg et al., Plaintiffs,**

v.

**BENDIX CORPORATION, Defendant.**

Civ. A. No. K74–404.

United States District Court,
W. D. Michigan, S. D.

April 4, 1980.

Keller, Keller & Creager, St. Joseph, Mich., for plaintiffs; Harry J. Creager, St. Joseph, Mich., of counsel.

Noel C. Crowley, Corp. Counsel, Southfield, Mich., for defendant.

## OPINION

FOX, Senior District Judge.

This is an action pursuant to Title VII of the Civil Rights Act of 1964. The plaintiffs are women employees of Bendix who allege that Bendix unlawfully discriminated against them, on the basis of their sex, in its overtime policies. Bendix agrees that it did so. The complaint was originally filed as a class action but plaintiffs have dropped that claim and the parties have now agreed that this case only involves a claim for back pay to the individual plaintiffs. This matter comes before the court on Bendix's motion for summary judgment. It is not contested that plaintiffs have met all the jurisdictional prerequisites to filing suit.

Prior to April 1970 the defendant limited the number of hours women, but not men, could work per day and per week at its St. Joseph plant. It did so according to the provisions of the Michigan female protective statute.[1]

The affidavit of Jack R. Wilson, Manager of personnel and security at the plant, stated that he knew of the existence of and relied on the guidelines of the Equal Employment Opportunity Commission regarding the conflict between Title VII and the state statute.[2]

On March 15, 1968 the Employers Association of Detroit issued a bulletin, Number 1923, announcing the EEOC guideline of

---

[1] 408.59. Hours of labor, females, males under 18; posting copy of section; exceptions; employments prohibited.

Sec. 9. No male under the age of 18 years, and no female shall be employed, permitted or suffered to work in any factory, . . . . for a period longer than an average of 9 hours a day or 54 hours in any week nor more than 10 hours in any one day; . . . .

408.94. Penalty

Sec. 54. Any person who violates or omits to comply with any of the foregoing provisions of this act, or who interferes in any manner with the factory inspector in the discharge of his duties, or who suffers or permits any child or female to be employed in violation of its provisions, shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than 10 nor more than 100 dollars or by imprisonment for not less than 10 nor more than 90 days, or by both such fine and imprisonment in the discretion of the court.

[2] It was not until August 1969 that the Equal Employment Opportunity Commission announced the position that such statutes were in conflict with Title VII. For a discussion of the vacillation of the Commission on this point, see *Kober v. Westinghouse Electric Corp.*, 325 F.Supp. 467 (W.D.Pa.1971).

February 24, 1968 that protective statutes presumptively do not violate Title VII.[3]

Pursuant to its Labor Agreement, Bendix had a policy of overtime equalization among its employees. It used a "charged" time method for determining overtime rationing on weekends. Employees who refused overtime during the week were charged and not considered for weekend work until other employees were first offered the opportunity. Women who could not work overtime because of the protective statute were not charged with a refusal of the time. At times, as a result, they were first offered overtime on the weekends. However, Bendix began to receive complaints from its male employees and as of June 1, 1968, through union negotiations, women were charged with the number of hours they were prevented from working as a result of the state statute.

Bendix, "with care and precision," monitored and followed various changes in the protective statute and attendant enforcement policy. As a result of state statutory conflict Bendix ceased to apply the protective limitations to women from November 2, 1967 to on or about April 8, 1968 (Ex. H). The Michigan legislature enacted two statutes repealing the protective legislation. The first provided for outright repeal, was approved by the Governor June 30, 1967 with an effective date of November 2, 1967. The other provided for repeal upon the promulgation of standards by the Michigan Occupational Safety Standards Commission (OSSC) and was signed by the Governor on August 1, 1967 and took immediate effect. On August 8, 1967 the Michigan Manufacturer's Association in its "Industry Reporter"[4] reported that the maximum work legislation was repealed effective November 2, 1967. On March 18, 1968, the Michigan Attorney General, in Opinion 4617, announced that the legislature's later enactment was controlling and that the protective statute remained in effect.[5]

Bendix also planned to abandon the limitation on overtime to women on February 15, 1969, the scheduled date of implementation of regulations issued by OSSC. However a Wayne County Circuit Court enjoined the implementation and Bendix continued to observe the statutory limitations (Exs. I, J, K).

On August 19, 1969 the Equal Employment Opportunity Commission published its new guidelines considering State protective statutes to be in conflict with Title VII of the Civil Rights Act of 1964. Bendix cannot recall when it learned of the policy revision, P. 8 of Wilson affidavit, but it has submitted a copy of the Employers Association of Detroit newsletter of September 25, 1969 which spotted the conflict and reported that the State (Michigan) would continue to enforce the overtime limitations of the state statute (Ex. M).

The Michigan Attorney General issued an opinion dated December 30, 1969 declaring that the protective statute was superseded by Title VII of the 1964 Civil Rights Act (Ex. N). The Michigan Manufacturer's Association and the Employers Association of Detroit announced the opinion on January 29 and 27, 1970, respectively (Ex. O, P).

On February 10, 1970 Bendix ceased the overtime limiting practice and on or about April 20, 1970 all women's records were not charged for overtime "refused," retroactive to January 1, 1970.

The standards that the court should use on the question of retroactive award of back pay are found in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280. The case involved an employer who took steps on its own initiative to change discriminatory practices, as judicial interpretations evolved. In the subsequent suit the employees expressly disclaimed any interest in back pay, probably due to the uncertain state of the law, 422 U.S. at 441, 95 S.Ct. at 2384, concurrence of Justice

---

**3.** Exhibit E of docket # 31, Affidavit of Jack R. Wilson.

**4.** Bendix kept abreast of industry news through the publications of the Michigan Manufactur-

er's Association and The Employers Association of Detroit, affidavit of Jack R. Wilson.

**5.** Exhibit F (Bendix received this copy in January 1971).

Marshall, and four years later moved to add a claim for back pay. The trial court denied the relief on the grounds that a bad faith violation of Title VII of the Act had not been shown and that Albemarle would be prejudiced by the demand made late in the litigation and contrary to earlier representations. The Supreme Court remanded for a determination as to whether the defendant was in fact prejudiced and whether the employees–plaintiffs' conduct was excusable.

The *Albemarle* court announced the standard that back pay was a normal remedy which should be denied only for reasons, which if applied generally, would not frustrate the statutory purposes of eradicating discrimination in the economy and making whole the victims of unlawful discrimination. Back pay has a direct relationship to these goals. It is a prophylactic device aimed at removing barriers to equal employment opportunity. It is an incentive that causes employers to self examine their practices and shun those of "dubious legality." This spur is missing if the employer faces only the likelihood of prospective relief. Where unlawful discrimination is found the court has not only the power, but the duty, to render a decree that will not only bar discrimination in the future, but to eliminate the effects of past practices. The remedy should be equal to the injury and place the injured party in a position near as he would have been had not the injury happened. The relief should be complete as possible. It does not frustrate the purposes of the Act to deny back pay in a particular cause where a party causes improper and substantial prejudice to the other party through eccentric prosecution of the suit.

The *Albemarle* presumption of retroactive relief was reaffirmed, but such relief

denied in *Los Angeles Dept. of W & P v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657. Arising on a motion, the case involved sex discrimination in an employer–run pension plan. The plan was based on the true fact that women, as a class, live longer than men. Such conclusions are necessary to the actuarial soundness of the plan. Thus the case did not involve sterotypes about differences between men and women. Because of their longer life, women would draw a greater amount of benefits at a monthly rate equal to men. As a result women had to contribute more to the plan while employed and took home smaller paychecks. The Supreme Court found the plan to violate Title VII but denied retroactive relief. The discrimination was based on fact. It was standard practice in the insurance- pension industry to assume that women employees would have to contribute more to a plan or take less benefits because of their longer life. A conscientious administrator could have believed the action lawful; the courts had been silent and administrative agencies had conflicting views.[6] In such a light even self examination under the prod of possible retroactive relief may not change the action and the prophylactic effect of prospective retroactive relief was absent. Finally, the Court recognized the potential for devastating harm to a 450 billion dollar industry through unforeseen disbursement in the nature of retroactive awards to women who had made higher contributions.

█ There is no question that the female protective statute was a violation of the plaintiffs' rights under Title VII. Bendix asserts, however, that the statute is a defense to a back pay award. The question is open. The *Albemarle* Court reserved the question [7] which the *Manhart* Court noted.[8]

6. The EEOC declared the practice to violate the law but the Office of Contract Compliance and the Wage and Hour Administrator concluded that there was no violation in this circumstance.

7. 422 U.S. at 423, n.18, 95 S.Ct. at 2374, n.18.
    18. We note that some courts have denied backpay, and limited their judgments to declaratory relief, in cases where the employer

discriminated on sexual grounds in reliance on state "female protective" statutes that were inconsistent with Title VII. See, e. g., *Kober v. Westinghouse Electric Corp.*, 480 F.2d 240 (CA3 1973); *LeBlanc v. Southern Bell Telephone & Telegraph Co.*, 460 F.2d 1228 (CA5 1972); *Manning v. General Motors Corp.*, 466 F.2d 812 (CA6 1972); *Rosen-*

8. See note 8 on page 419.

The recent Sixth Circuit decision in *Palmer v. General Mills, Inc.*, 600 F.2d 595 (6th Cir. 1979), which involved a claim for back pay during the period the Ohio female protective statute was in effect, did not resolve the question. The case was decided on the ground that the plaintiffs had not met their burden of proof of economic injury. The prior rule was stated in *Manning v. General Motors Corp.*, 466 F.2d 812 (6th Cir. 1972), that good faith reliance on a state protective statute was a good defense to back pay relief. This holding was weakened by the U.S. Supreme Court decision in *Albemarle* that good faith is not a defense to retroactive relief. The *Palmer* Court recognized that an employer's reliance on a state law cannot be equated with mere good faith intent. This reliance must be balanced against the make–whole objective of the Act, 600 F.2d at 599. A state protective statute then does not present a *per se* exception to the *Albemarle* presumption but is a factor to weigh in the decision.

The *Albemarle* Court recognized that an employer may have narrow but complete statutory defense to back pay. Title VII, 42 U.S.C. § 2000e–12(b)[9] applies where an employer, in good faith and in conformity with such interpretation, relies on any written interpretation of the Equal Employment Opportunity Commission, 422 U.S. at 423, 95 S.Ct. at 2374. The reliance must be actual as evidenced by a bona fide decision made during the period in question, *Stryker v. Register Publishing Co.*, 423 F.Supp. 476 (D.Conn.1976). The record here establishes awareness of, but not actual reliance on any EEOC guideline. It is well documented that Bendix followed the changes in the state statute with precision (of the three internal memoranda all apply to changes in state law and enforcement policy, Ex. H, J, K). Changes in the EEOC position went by without notice or comment by Bendix. A conclusion of lack of reliance is further supported by the fact that Bendix did nothing at all after the EEOC announced finally on August 19, 1969 that the state protective statutes were in conflict with Title VII of the 1964 Civil Rights Act. Bendix did not change its employment practices as it had two years earlier on the notice of change in the state law. It did not seek to reconcile the Federal–State law conflict. If Bendix was "on the horns of a dilemma" it would have made a choice and that choice would have left a record. But here Bendix cannot recall when or how it heard of the EEOC change or what it did on so hearing. It was not until an announcement that the State of Michigan would no longer enforce the law against employers covered by Title VII that Bendix did act. It changed its practices in reliance. A position that it relied on all other guidelines of the EEOC except the August 19, 1969 one is incredible. Actual reliance is not shown on these facts. The fact that Bendix did not change its employment practices on the publication of the August 1969 standards shows a lack of conformity as well. Defense to liability under 42 U.S.C. § 2000e–7 is not established.

This case does not present any individual equities between the parties that would operate to overcome the presumption of back pay relief where discrimination violative of

---

feld v. *Southern Pacific Co.*, 444 F.2d 1219 (CA 1971). There is no occasion in this case to decide whether these decisions were correct. As to the effect of Title VII on state statutes inconsistent with it, see 42 USC § 2000e–7 [42 USCS § 2000e–7].

**8.** 435 U.S. at 719, n.35, 98 S.Ct. at 1381, n.35.

**35.** Specifically, the Court held that a defendant prejudiced by his reliance on a plaintiff's initial waiver of any backpay claims could be absolved of backpay liability by a district court. Id. [422 U.S.] at 424, 95 S.Ct. 2362 [at 2374], 45 L.Ed.2d 280. The Court reserved the question whether reliance of a different kind–on state "protective" laws requiring sex differentiation–would also save a defendant from liability. Id., at 423 n.18, 95 S.Ct. 2362 [at 2374 n.18], 45 L.Ed.2d 280.

**9.** (b) In any action or proceeding based on any alleged unlawful employment practice, no person shall be subject to any liability or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission.

Title VII is found. The fact that one of the parties, the employer, could have been prosecuted for violation of a state statute does not meet the *Albemarle* exception for the enforcement of federal rights could be greatly hampered if individual state laws had to be invalidated one at a time. This would be frustration of one of the central goals of the 1964 Civil Rights Act, the eradication of unlawful discrimination.

The decision of the *Manhart* Court allows a trial judge to consider "background" factors in the decision to grant retroactive relief. *Manhart* involved the fact that women, as a class, live longer than men. It did not involve a "fictional difference between men and women," 435 U.S. at 707, 98 S.Ct. at 1374. This case does. The assumption behind protective legislation is that women, as a class, cannot work as long as men and particularly cannot work more than 10 hours a day or 54 hours per week. Common experience tells us that this is false and Bendix had first-hand knowledge of this fact. From November 1967 to April 1968 women were able to work in its plant without the limitations imposed by the statute. Such limitations as surviving in the period that this case considers, were the product of fictional differences between men and women. "It is now well recognized that employment decisions cannot be predicted on mere 'sterotyped' impressions about the characteristics of males and females," 435 U.S. at 707, 98 S.Ct. at 1374. (*Id.*) Thus while Bendix may have made the employment decision to limit overtime opportunities to women based on adherence to state law, not on sterotyped thinking, it is clear that to a conscientious employer the protective legislation involved here would raise a conflict with Title VII whereas the pension plan in *Manhart* may not have.

There is another difference between the situation here and that of *Manhart*. The distinction lies in the fact that Title VII may not have been "intended to revolutionize the insurance and pension industries," 435 U.S. at 717, 98 S.Ct. at 1380, but it was intended to revolutionize the employment industry. "The very statutory words [were] intended as a spur or catalyst to cause 'employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history' ...." *Steelworkers v. Weber*, 443 U.S. 193, 204, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480, 489, quoting *Albemarle*, 422 U.S. at 418, 95 S.Ct. at 2372. The problem we confront here is not one incidental to the central goal of eradicating discrimination in employment but represents the epitome of sex discrimination in employment.

This case does not present the prospect of a large 450 billion dollar industry collapsing due to court decision. This case comes long after the practices were abandoned throughout the country. It is now an isolated dispute between a small group of women employees and their employer. The type of relief they seek is not revolutionary. The employment industry standard remedy is back pay on a finding of unlawful discrimination. In award of relief, this case is indistinguishable from an award in any other employment case.

▮ Thus, the Michigan statute does not present the kind of equitable consideration that the Court in *Albemarle* and *Manhart* considered would bar retroactive relief. However, it still must be considered whether the Michigan protective statute presents an exceptional circumstance that would bar relief. It is settled that the statute provides no defense to a Title VII action, *Manning v. General Motors Corp.*, 466 F.2d 812 (6th Cir. 1972). State statutes in conflict with Title VII are of no force and effect by 42 U.S.C. § 2000e–7,[10] and U.S.Const. Art. 6, cl. 2, *Ridinger v. General Motors Corp.*, 325 F.Supp. 1089 (S.D.Ohio 1971), rev'd on

10. **§ 2000e–7. Effect on State laws**

Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.

other grounds, 474 F.2d 949. While the mere existence of a female protective statute does not present a defense to back pay relief, *Stryker v. Register Publishing Co.*, 423 F.Supp. 476 (D.Conn.1976), the court must weigh it as a factor in exercising its discretion in determining the appropriate relief, *Palmer v. General Mills, Inc.*, 600 F.2d 595 (6th Cir. 1979). The question then is, as an equitable consideration does the Michigan female protective statute and Bendix's practical necessity of complying with it rebut the presumption in favor of back pay relief to the plaintiffs?

By violating the Michigan statute, Bendix would have exposed itself to a fine of 10 to 100 dollars and/or imprisonment for a period of 10 to 90 days. The court notes that in the relevant period, after July 1965, the statute was cited in no reported cases of Michigan courts. If one assumes a vigorous policy of enforcement, the effects of a vigorous defense (appeals) should be found. The conclusion is that after the enactment of Title VII there was no challenge to the protective statute; no appeal of a fine or imprisonment where the federal statute was raised in defense. One need not speculate that far, for the facts on the record of this motion support the conclusion that Bendix complied with the Michigan statute, not under the threat of prosecution, but as a corporate policy of following the Michigan act in disregard to the Federal statute. Of course if it be assumed that if Bendix were to violate the Michigan law and follow an employment policy based on Title VII, that prosecution were certain, it cannot be overlooked that Bendix would have the Federal law as complete defense (by 42 U.S.C. § 2000e–7, *supra, Riddinger, supra*) and that even if convicted of violation of the statute could face a fine as small as ten dollars. Considered against the statutory objectives of Title VII the injury to the victims of the discrimination alone outweighs any fine. It cannot be said that the possible penalty to Bendix was so severe that the possibility of retroactive relief, in a subsequent civil rights action, would not provide an incentive to follow federal law.

■ Bendix argues that it is unreasonable to expect an employer to anticipate a ruling invalidating the particular Michigan statute since there was no authoritative interpretation of the effect of Title VII on it until that of the Michigan Attorney General of December 30, 1969. Uncertainty of the law is no defense in a Title VII action, *McCormick v. Attala County Bd. of Ed.*, 541 F.2d 1094 (5th Cir. 1976). The court may weigh it as a factor in exercising its discretion, *Albemarle, supra.*

The Michigan statute was not unique. Insofar as relevant here, it merely limited the number of hours women could work, but did not so limit men. During the period under consideration, there were federal court decisions invalidating other state statutes or employer practices, with similar limitations on the number of hours women could work, as in conflict with Title VII. Thus a conscientious employer would have had notice that such a practice was of "dubious legality." By the time the Michigan Attorney General issued his opinion he could cite to four cases [11] and the Equal Employment Opportunity Commission's guideline of August 1969 for support of the proposition that Title VII had superseded the Michigan statute. Thus this is not a case where an employer was led to believe that his conduct comported with the requirements of federal law. Nor is there found such uncertainty that to award retroactive relief to the plaintiffs would be inequitable in light of the goals of the Civil Rights Act of 1964.

Bendix's motion for summary judgment, based on the Michigan female protective statute as a defense to back pay relief, is denied.

11. *Rosenfeld v. Southern Pacific Co.*, 293 F.Supp. 1219 (C.D.Cal.1968); *Richards v. Griffith Rubber Mills*, 300 F.Supp. 338 (D.Ore. 1969); *Bowe v. Colgate–Palmolive Co.*, 416 F.2d 711 (7th Cir. 1969); *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969). See p. 3 of Michigan Attorney General Opinion # 4687, December 30, 1969. (Ex. N).